## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Antoinette Torres,

Case No. 15-cv-4416 (JRT/TNL)

        Plaintiff,

v.

**REPORT AND
RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

        Defendant.

David F. Chermol, Chermol & Fisherman LLC, 11450 Bustleton Avenue, Philadelphia, PA 19116, and Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401 (for Plaintiff); and

Gregory G. Brooker, Assistant United States Attorney, United States Attorney's Office, 300 South 4th Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

## I.   INTRODUCTION

Plaintiff Antoinette Torres brings the present action, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–34, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1382. This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 7.2 and 72.1. Being duly advised of all the files, records, and

proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 16) be **DENIED** and Defendant's Motion for Summary Judgment (ECF No. 20) be **GRANTED**.

## II.   FACTS

### A. Procedural History

Plaintiff filed the instant action for DIB and SSI on August 16, 2012, alleging a disability onset date of July 19, 2012. (Tr. 191–202; *see* Tr. 237–44). Plaintiff alleges impairments of lupus, connective tissue disease, high blood pressure, autoimmune hepatitis, and arthritis. (Tr. 238). Plaintiff was found not disabled on November 27, 2012. (Tr. 70–91; *see* Tr. 118–23). The finding of no disability was affirmed upon reconsideration. (Tr. 92–115; *see* Tr. 129–34).

Plaintiff then requested a hearing before an Administrative Law Judge. (Tr. 135–36; *see* Tr. 137–43, 152–76, 181, 184–90). A hearing was held March 14, 2014, and on March 26, 2014, Administrative Law Judge Eskunder Boyd issued a decision denying Plaintiff's claim for benefits. (Tr. 23–40). Plaintiff sought review of ALJ Boyd's decision through the Appeals Council. (Tr. 285–86, 21–22). The Appeals Council considered Plaintiff's reasons for disagreeing with ALJ Boyd's decision and found no basis for reviewing his decision. (Tr. 6–11). Plaintiff then sought review in this Court, with Plaintiff and Defendant filing cross-motions for summary judgment. (ECF Nos. 16, 20).

### B.  Employment Background

Plaintiff worked as a housekeeper from January 1998 through July 2012 at several hotels, where she was tasked with cleaning rooms. (Tr. 226–29, 282). Plaintiff stopped working in 2012. (Tr. 203–25).

### C.  Medical Records

#### 1.  2011

On January 13, 2011, Plaintiff saw Dr. Paul Florell at Sanford Health Clinic in Alexandria, Minnesota. (Tr. 299–300). Plaintiff had developed "what looks like a discoid lupus-like rash, kind of plaque-like, on her right arm and anterior chest in the open area of her blouse" with no other part of her body affected except for the back of the neck. (Tr. 299). Plaintiff reported feeling well otherwise. (Tr. 299). Upon examination, Plaintiff's joints did not show any proliferative synovitis[1] or destructive changes. (Tr. 299). Dr. Florell prescribed triamcinolone[2] for the rash. (Tr. 299).

On September 7, 2011, Plaintiff saw Dr. Florell. (Tr. 300–02). Plaintiff reported general aches and pains. (Tr. 301). Plaintiff's skin rash was better on the chest and back, but some remained on the right arm. (Tr. 301). Plaintiff declined referral to a dermatologist. (Tr. 301).

---

[1] Synovitis is inflammation of a synovial membrane usually with pain and swelling of the joint. *Synovitis*, MedlinePlus Medical Dictionary, Merriam-Webster, *available at* http://c.merriam-webster.com/medlineplus/synovitis (last visited Jan. 12, 2017).

[2] Triamcinolone is a corticosteroid used to help relieve redness, itching, swelling, or other discomfort caused by skin conditions. *Triamcinolone (On the skin)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012519/ (last visited Jan. 12, 2017).

## 2.   2012

On April 7, 2012, Plaintiff saw Dr. Florell. (Tr. 303–04). Plaintiff reported having "a lot more pain in her joints, particularly her right wrist, left ankle, and her knees," as well as some swelling. (Tr. 303). Upon examination, Dr. Florell found Plaintiff's joints to not have "a lot of inflammatory change." (Tr. 303). Dr. Florell did find Plaintiff's middle finger on her right hand to have S1 level synovitis. (Tr. 303). Dr. Florell ordered some testing and prescribed a prednisone[3] taper. (Tr. 303).

On April 27, 2012, Plaintiff saw Dr. Florell for a follow-up. (Tr. 304). Testing showed Plaintiff had negative anti-CCP antibody and rheumatoid factors, but did have elevated antinuclear antibodies. (Tr. 304). Plaintiff reported no benefit to her aches and pains from to the prednisone taper. (Tr. 304). Dr. Florell recommended Plaintiff wait to see if she improved without further medications given that she had recent excessive sunlight exposure while in Texas. (Tr. 304).

On June 26, 2012, Plaintiff saw Nurse Practitioner Tina Evenson at Sanford Health Clinic in Alexandria, Minnesota with joint pain in her wrist, elbows, knees, and feet. (Tr. 305–06). Plaintiff reported working over the weekend as a housekeeper, leaving her "barely able to function this morning." (Tr. 305). Plaintiff declined to have any lab testing, deciding to wait until an upcoming doctor appointment. (Tr. 306). Plaintiff was referred for a rheumatology consult. (Tr. 306).

---

[3] Prednisone is used to relieve inflammation. *Prednisone (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011828/ (last visited Jan. 12, 2017).

On July 5, 2012, Plaintiff saw Dr. Scott Hegstad at Sanford Health Clinic in Alexandria, Minnesota for establishment of care. (Tr. 307). Plaintiff reported soreness in her knees, wrists, hands, neck, and upper back. (Tr. 307). Dr. Hegstad noted Plaintiff ambulated "in a very stiff and deliberate fashion." (Tr. 307). Dr. Hegstad prescribed Neurontin.[4] (Tr. 307).

On July 23, 2012, Plaintiff saw Dr. Bharath Akkara Veetil at CentraCare Clinic in St. Cloud, Minnesota for a consultation for autoimmune hepatitis. (Tr. 292–95). Plaintiff reported being healthy "until about five to seven years [a]go when she developed progressive joint pain in her ankles, feet, hands and wrists. Over the last very many years, this has gradually progressed." (Tr. 292). Plaintiff described her current joint pain as "fairly localized," predominantly involving her ankles and wrists and rated the pain as 8 to 9 on a 10 scale. (Tr. 292). Plaintiff stated her joint pain frequently interferes with daily living activities, lasting throughout the day and one to two hours of significant early-morning stiffness, including instances of inability to get out of bed. (Tr. 292). Plaintiff reported that she has had improvement with high doses of steroids. (Tr. 292). Plaintiff stated her joint pain had been worse for the last six months. (Tr. 292). For her current symptoms, Plaintiff reported significant pain and swelling of both knees, with her right worse than her left. (Tr. 292). Plaintiff report recent episodes of skin rashes. (Tr. 292). Upon examination, Plaintiff had extensive synovitis involving both wrists, right worse than left, involving the second, third, and fourth MCP and PIP joints of both hands.

---

[4] Neurontin is a brand name for gabapentin, which "works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system. It is not used for routine pain caused by minor injuries or arthritis." *Gabapentin (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010419/ (last visited Jan. 12, 2017).

(Tr. 293). Plaintiff was unable to make a full fist with her left hand. (Tr. 293). There was no synovitis of the shoulders and her range of motion of the shoulders and elbows was within functional limits. (Tr. 293). Plaintiff had extensive synovitis of both knees, with a large effusion of the right knee. (Tr. 293). Plaintiff also had synovitis of both ankles. (Tr. 293). Plaintiff had an antalgic gait due to foot pain. (Tr. 293). Proximal and distal strength in the upper and lower extremities was grossly intact. (Tr. 293). Dr. Veetil's assessment was that Plaintiff had a connective tissue disease with inflammatory arthritis that may progress to lupus. (Tr. 294). Dr. Veetil also noted that Plaintiff likely had autoimmune hepatitis given her medical history. (Tr. 294). Dr. Veetil prescribed prednisone to be taken 30mg daily for 10 days, 20mg daily for 10 days, then 15mg daily until Plaintiff returned for a follow-up. (Tr. 294).

On August 14, 2012, Plaintiff was seen for a follow-up with Dr. Veetil after starting corticosteroids. (Tr. 288–91). Plaintiff reported feeling better on prednisone with a 30mg dose, but noticed significant pain and discomfort, predominantly in her knees, when she went to a 20mg dose, so she went back up to 30mg. (Tr. 290). Plaintiff reported significant early-morning stiffness, largely involving both knees. (Tr. 290). Plaintiff reported both knees continue to be swollen and that she found it difficult to ambulate, rating her pain at 7 to 8 out of 10 in intensity. (Tr. 290). Plaintiff could not completely extend the knee due to joint pain. (Tr. 290). Plaintiff's joint pain and swelling involving both hands had significantly decreased. (Tr. 290). Plaintiff had good range of motion of both wrists and was able to make a fist. (Tr. 290). Plaintiff was tolerating prednisone

well. (Tr. 290). Plaintiff did not have any skin ulcers, nodules, or rashes. (Tr. 290). Plaintiff then underwent an aspiration and injection of both her knee joints. (Tr. 288–89).

On August 21, 2012, Plaintiff saw Dr. Hegstad for a follow-up to an emergency room visit, where she reported severe chest and back pain, as well as nausea and vomiting. (Tr. 310–11; *see* Tr. 309–10). Plaintiff reported her level of discomfort had improved a great deal over the last few days. (Tr. 311). Plaintiff reported that her joint and associated muscle aches were not "hugely different" from what she considered her baseline. (Tr. 311). Upon examination, Plaintiff had "a lot of trigger point tenderness." (Tr. 311). The range of motion of her extremities was grossly intact and symmetric. (Tr. 311). Plaintiff was prescribed omeprazole[5] and directed to follow up with the rheumatology department. (Tr. 311). Plaintiff was also prescribed a nicotine patch to assist in smoking cessation. (Tr. 311).

On October 15, 2012, Plaintiff saw Dr. Veetil. (Tr. 323–26, 394–97). Plaintiff reported her arthritis symptoms had improved on prednisone. (Tr. 323, 394). Plaintiff reported pain in her knees, particularly with activity, rating it at 3 to 4 out of 10. (Tr. 323, 394). Swelling had gone down significantly. (Tr. 323). Plaintiff reported some stiffness and pain in her hands and feet towards the end of the day. (Tr. 323, 394). The Raynaud's phenomenon[6] involving both of Plaintiff's hands had improved. (Tr. 324, 394). Upon

---

[5] Omeprazole is used to treat heartburn, a damaged esophagus, stomach ulcers, and gastroesophageal reflux disease. *Omeprazole (By mouth),* PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011495/ (last visited Jan. 12, 2017).

[6] Raynaud's phenomenon is the name for the symptoms associated with Raynaud's disease, "a vascular disorder that is marked by recurrent spasm of the capillaries and especially those of the fingers and toes upon exposure to cold, that is characterized by pallor, cyanosis, and redness in succession usually accompanied by pain, and that in severe cases progresses to local gangrene." *Raynaud's disease,*

examination, Plaintiff had good range of motion of knees, wrists, and hands. (Tr. 324, 395). Dr. Veetil noted: "At this time I feel that the patient's disease control has improved on the high dose prednisone which has been tapered down. Her inflammatory arthritis is much better." (Tr. 324, 395). Dr. Veetil proposed keeping Plaintiff on prednisone, then tapering down slowly, as well as stopping Imuran[7] completely. (Tr. 324–25, 395–96).

### 3.   2013

On January 3, 2013, Plaintiff saw Dr. Veetil. (Tr. 329–339, 385–90). Plaintiff stated her hand and wrist swelling had improved, as well as her early morning stiffness. (Tr. 329, 388). Plaintiff reported continued significant pain and swelling in both knees impairing her activities of daily living, such as going up or down a flight of stairs. (Tr. 329, 388). Plaintiff continued to have Raynaud's phenomenon in both hands, particularly during this winter. (Tr. 330, 388). Upon examination, Plaintiff had extensive synovitis with large effusions in both knees, right worse than left, and was unable to flex both knees. (Tr. 330, 389). Plaintiff had no synovitis in her hands or feet. (Tr. 330, 389). Dr. Veetil suspected that Plaintiff had osteoarthritis contributing to her knee discomfort given the lack of inflammation in her hands. (Tr. 331, 389). Dr. Veetil then performed an aspiration and injection of each of Plaintiff's knees. (Tr. 332–33, 385–87).

---

MedlinePlus Medical Dictionary, Merriam-Webster, *available at* http://c.merriam-webster.com/medlineplus/Raynaud's%20disease (last visited Jan. 12, 2017).

[7] Imuran is a brand name for azathioprine, which is used to treat rheumatoid arthritis. *Azathioprine (By mouth),* PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009164/ (last visited Jan. 12, 2017).

On January 11, 2013, Plaintiff was seen by Dr. Hegstad. (Tr. 372). Upon examination, Plaintiff's knees demonstrated some swelling and Plaintiff was tender to palpation around the medial and lateral joint lines of both knees. (Tr. 372).

On January 24, 2013, Plaintiff saw Dr. Thomas Dudley at Heartland Orthopedic Specialists for her bilateral knee pain. (Tr. 347–49, 367–69). Plaintiff reported pain with climbing stairs, walking long distances, and swelling into the knees. (Tr. 347, 367). Plaintiff reported mild short-term relief with aspiration and injection into her knees. (Tr. 347, 367). Dr. Dudley assessed Plaintiff as having diffuse diseases of connective tissue, systemic lupus erythematosus, as well as osteoarthritis and allied disorders. (Tr. 349, 369). In sum, Dr. Dudley concluded Plaintiff has "an inflammatory arthritis which is the cause of her knee swelling" that he felt was related to her history of lupus. (Tr. 349, 369). Dr. Dudley also concluded that Plaintiff has moderate osteoarthritis of the patella, which produced decreased knee range of motion and weakness, and tenderness over the quadriceps. (Tr. 349, 369). Dr. Dudley believed Plaintiff would not be a candidate for total knee replacement and that knee arthroscopy would not decrease her knee pain; rather, he recommended she continue with cortisone injections and anti-inflammatory medications. (Tr. 349, 369). Dr. Dudley also believed Plaintiff would benefit from working with a physical therapist to regain knee range of motion, strength, and endurance. (Tr. 349, 369).

On January 31, 2013, Plaintiff had a physical therapy evaluation with physical therapist Dianne Doyle. (Tr. 344–46, 361–66). Plaintiff reported pain in her left thigh and knee. (Tr. 344, 361, 364). Doyle found Plaintiff's functional impairment to be moderate

when present, only interfering with some daily activities. (Tr. 344, 361, 364). Plaintiff rated her pain at 8 out of 10 and reported standing and walking as aggravating factors. (Tr. 344, 361, 364). Plaintiff's physical therapy goals were to undertake an independent and consistent home exercise program and to ambulate with normal gait pattern for community distances without pain within four weeks. (Tr. 345, 362, 365).

On February 4, 7, and 18, 2013, Plaintiff had physical therapy sessions with Doyle and Scott Scholl. (Tr. 340–43, 355–60). Plaintiff reported pain in both knees that was somewhat more severe since her last visit, asserting that the performance of exercises made her knees sorer. (Tr. 342, 359, 340, 357, 355).[8] Doyle had Plaintiff perform therapeutic exercises. (Tr. 343, 360, 341, 358, 356).

On February 26, 2013, Plaintiff saw Dr. Dudley for a follow-up. (Tr. 352–54). Plaintiff reported that she had "not noticed much improvement, if any at all" from physical therapy. (Tr. 352). Plaintiff stated she noticed increased swelling after her therapy sessions. (Tr. 352). Dr. Dudley performed a Synvisc[9] injection in each of Plaintiff's knees. (Tr. 354).

On March 7, 2013, Plaintiff had a follow-up Synvisc injection. (Tr. 350–51). Plaintiff reported mild swelling and pain following the previous injections, but no

---

[8] It is unclear whether Plaintiff reported pain that had worsened due to exercise at each of her physical therapy sessions or just the first one because it appears the treatment notes were simply cut and pasted for each visit with the only discernible change between the treatment notes being the amount of time billed.
[9] Synvisc is a brand name for hylan polymers A and B, which is used to treat knee pain caused by osteoarthritis in patients "who have already been treated with pain relievers . . . and other non-drug treatments that did not work well." *Hylan Polymers A and B (Injection route),* PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010633/ (last visited Jan. 13, 2017). Hylan polymers acts as a lubricant and shock absorber in the joints to help them work properly. *Id.*

adverse reactions to the injections. (Tr. 350). Plaintiff received a Synvisc injection in both knees. (Tr. 351).

On March 18, 2013, Plaintiff saw Dr. Dudley. (Tr. 399–401). Plaintiff reported some improvement following a second injection, but continued to have flare ups at nighttime. (Tr. 399). Dr. Dudley injected Synvisc into each of Plaintiff's knees. (Tr. 400). Plaintiff was encouraged to continue with her home exercise program. (Tr. 401).

On April 24, 2013, Plaintiff saw Dr. Veetil. (Tr. 378–82). Plaintiff was tapered down to prednisone 5mg daily over the previous two to three months, but had a flare initially involving her hands and subsequently involving her knees. (Tr. 380). Plaintiff received Synvisc injections from her orthopedic provider without significant improvement. (Tr. 380). Plaintiff noted that her hand swelling improved with 15mg dosages of prednisone, but continued to have significant pain, stiffness, and swelling of both knees. (Tr. 380). Plaintiff reported she was unable to stand or walk for prolonged periods and rated her knee symptoms as 7 out of 10 in intensity. (Tr. 380). Given the continued arthritis symptoms involving her knees, Dr. Veetil stopped Plaintiff's Imuran and started methotrexate.[10] (Tr. 382). Dr. Veetil suspected that Plaintiff's knee symptoms were related to osteoarthritis rather than inflammatory arthritis. (Tr. 382). Dr. Veetil also aspirated and injected each of Plaintiff's knees. (Tr. 378–79).

---

[10] Methotrexate is used to treat adults with severe rheumatoid arthritis who had other treatments that did not work well. *Methotrexate (By mouth),* PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011139/ (last visited Jan. 13, 2017).

On April 29, 2013, Plaintiff saw Dr. Hegstad for abdominal discomfort, but reported she recently had a steroid injection in each of her knees and that she was ambulating better and felt as though the injections were very helpful. (Tr. 403).

On May 21, 2013, Plaintiff saw Dr. Veetil for a follow-up. (Tr. 420–23). Plaintiff reported she was tolerating the methotrexate well. (Tr. 421). Plaintiff reported left knee pain and swelling, as well as early morning stiffness in her wrists, hands, and knees. (Tr. 421). Upon examination, Plaintiff had moderate-sized effusion of the left knee with minimal synovitis, no right knee effusion, and no synovitis of her hands or wrists. (Tr. 422). Plaintiff was referred to an orthopedic provider due to her continued left knee symptoms for possible knee replacement. (Tr. 422). Plaintiff was to reduce her prednisone to 5mg daily. (Tr. 423).

On June 17, 2013, Plaintiff saw Dr. Hegstad on complaints of increased swelling and discomfort. (Tr. 402). Plaintiff reported that when she tapered down from 7.5mg of prednisone to 5mg she saw an escalation in symptoms. (Tr. 402). Plaintiff reported that the small joints of her wrists were the most bothersome, with her knees and hips being bothersome as well. (Tr. 402). Plaintiff reported being active around the home following her husband's back surgery. (Tr. 402). Upon examination, Plaintiff had swelling in her fingers and some slight synovial thickening in the metacarpal phalangeal joints of each finger. (Tr. 402). Plaintiff was very stiff and deliberate in her wrist movement. (Tr. 402). There was no significant effusion noted in her knees and she was ambulating without any need for assistance. (Tr. 402). Dr. Hegstad returned Plaintiff to a 7.5mg daily prednisone dose. (Tr. 402).

On August 2, 2013, Plaintiff saw Dr. Matthew Hwang at St. Cloud Orthopedic Associates for an evaluation of her left knee. (Tr. 438–39, 469–70). Upon examination, Plaintiff had effusion of her left and right knee, with the left knee effusion larger, was diffusely tender to palpation, and was lacking 15 degrees of full extension in both knees. (Tr. 438, 469). Plaintiff had no instability and 5/5 strength in her knees. (Tr. 438, 469). Plaintiff walked with an antalgic gait. (Tr. 438, 470). Dr. Hwang's initial impression was that Plaintiff's symptoms were more related to her rheumatologic disorders rather than anatomical problems. (Tr. 439, 470). Dr. Hwang ordered an MRI to rule out anatomical problems. (Tr. 439, 470).

On August 8, 2013, Plaintiff saw Dr. Veetil. (Tr. 409–11). Plaintiff reported the symptoms in her hands and wrists had improved but she continued to have persistent pain and swelling in both knees, rating it at 8 to 9 out of 10. (Tr. 409). Plaintiff also reported continued early morning stiffness in pain, particularly with long standing and walking. (Tr. 409). Plaintiff reported tolerating the methotrexate well. (Tr. 409). Upon examination, Plaintiff had moderate-sized effusions with synovitis in both knees, and no synovitis of hands or wrists. (Tr. 410). Dr. Veetil increased Plaintiff's methotrexate dosage to target her continued bilateral knee swelling and pain. (Tr. 411).

On August 15, 2013, Plaintiff had an MRI of her left knee. (Tr. 434–35, 466–67). The MRI showed moderate diffuse synovitis throughout the joint capsule that may reflect synovial inflammatory disease; moderate to advanced chondral loss involving the superior articular surfaces of the patella and additional moderate chondral loss involving the central femoral trochlea; mild chondral loss involving the weight-bearing and

nonweight-bearing articular surfaces of the medial compartment; moderate-sized popliteal cyst formation posteriorly with mild to moderate synovitis; and no evidence of medial or lateral meniscal tearing. (Tr. 435, 467). Dr. Hwang interpreted the MRI as likely representing inflammatory process and that if her rheumatologist was unable to improve with disease modifying agents, he could consider partial or near-complete synovectomy to attempt to relieve synovitis. (Tr. 437).

On October 16, 2013, Plaintiff saw Dr. Hegstad. (Tr. 456). Plaintiff reported a flare over the last few weeks and months, with her knees being especially bothersome. (Tr. 456). Plaintiff reported being extremely stiff and limited with her ambulatory capabilities, asserting she was using a cane for assistance although she did not use one at her visit. (Tr. 456). Plaintiff's prescriptions were refilled. (Tr. 456).

On November 22, 2013, Plaintiff saw Dr. Hwang for a reevaluation of her left knee. (Tr. 436, 468). Upon examination, Plaintiff had a large interarticular effusion and pain with range of motion. (Tr. 436, 468). The treatment plan was left knee exam under anesthesia, diagnostic arthroscopy, and synovectomy. (Tr. 436, 468).

On December 27, 2013, Plaintiff saw Dr. Hegstad for a pre-operative physical. (Tr. 450–55). Upon examination, Plaintiff had synovial thickening involving the right third PIP joint without redness or warmth, and a small amount of swelling was present in both knees. (Tr. 452).

### 4.   2014

On January 2, 2014, Plaintiff underwent a left knee examination under anesthesia, diagnostic arthroscopy of her left knee, debridement of chondromalacia of trochlea and

medial femoral condyle of the left knee, and near complete synovectomy of the left knee. (Tr. 440–41, 471–72). Exam under anesthesia showed 5-10 degrees loss of full extension, grade 4 chondromalacia on the patellofemoral articulation with some early arthritis, grade 3 chondromalacia of the medial compartment with a small flap requiring debridement, some scuffing on the medial meniscus that was otherwise intact, intact ACL, and no significant pathology with the lateral compartment. (Tr. 440, 471). Dr. Hwang removed the synovium. (Tr. 440, 471).

On January 19, 2014, Plaintiff saw Dr. Bruce Evink at Alexandria Family Medicine with concerns about left knee pain. (Tr. 449). Plaintiff reported increasing pain over the previous two days, feeling warm at times, with some swelling. (Tr. 449). Upon examination, Plaintiff's left knee was not erythematous, but did feel slightly warmer than the right, the incision healing looked excellent and had no drainage, and range of motion was limited secondary to the pain to about full 40 degrees of excursion. (Tr. 449). Plaintiff was prescribed an antibiotic and was to continue physical therapy. (Tr. 449).

On February 5, 2014, Plaintiff saw Dr. Hegstad. (Tr. 442–48). Plaintiff's left knee seemed to have healed well and she was no longer relying on a walker for ambulatory assistance, but did note some swelling because she was standing for longer intervals. (Tr. 442). Plaintiff reported her range of motion returned to an expected level. (Tr. 442). Plaintiff reported a numbing sensation involving both of her feet and distal forelegs, more pronounced on the right than the left. (Tr. 442). Upon examination, Plaintiff's left knee showed minimal swelling, intact stability, and normal range of motion. (Tr. 442). Dr. Hegstad attributed the reported numbness to the sciatic nerve process. (Tr. 442).

### D.  Disability-Related Examinations and Assessments

Plaintiff completed a function report on October 16, 2012. (Tr. 245–56). Plaintiff reported that her ability to work is significantly impacted by her problems with lifting, bending, standing, walking, and kneeling. (Tr. 246). Plaintiff stated she wakes up at around 8:00 a.m. to take her medication, then rests for another hour before getting dressed for the day. (Tr. 246). She then eats a simple breakfast of toast, then a sandwich for lunch. (Tr. 246). Plaintiff then takes an afternoon nap for two hours. (Tr. 246). Plaintiff reported she watches television most of the day, but that she often does not pay attention to it. (Tr. 246–47, 251). Plaintiff's daughter makes dinner, but Plaintiff stated she may not have the appetite to eat it. (Tr. 247). In the evening, Plaintiff visits with her husband and watches television until around 10:30 p.m. (Tr. 247). Plaintiff reported she has difficulty sleeping due to pain in her ankles, knees, wrists, fingers, elbows, and hips, as well as anxiety. (Tr. 247). Plaintiff reported using pillows to elevate her feet to assist in falling asleep, and that she never feels rested the next day, requiring a nap. (Tr. 247). Plaintiff stated she has difficulties manipulating her hands to tie her shoes and grip bottles of soap in the shower. (Tr. 247). Plaintiff reported picking up around the house and washing dishes daily, but that her daughter completes the majority of household chores. (Tr. 249).

On April 10, 2013, Dr. Hegstad completed a form entitled "Physical Capacities Evaluation." (Tr. 370–71). In an eight-hour work day, Dr. Hegstad estimated Plaintiff could sit for 6 or more hours and could stand/walk for four hours, and that Plaintiff would need to alternate sitting and standing periodically. (Tr. 370). Dr. Hegstad opined Plaintiff

could grasp with her hands, push and pull light weights, could use her hands for repetitive motion tasks but it would likely increase her level of discomfort, and could not use her hands for fine manipulation. (Tr. 370). Dr. Hegstad opined Plaintiff could use both her feet for repetitive movements to operate foot controls. (Tr. 370). Regarding Plaintiff's ability to lift/carry weights, Dr. Hegstad selected options that she could occasionally lift/carry in the following ranges: 0 to 4 pounds, 5 to 9 pounds, and 10 to 19 pounds. (Tr. 370). Dr. Hegstad did not select the 20 to 49 pounds or 50 to 100 pounds categories. (Tr. 370). Dr. Hegstad indicated Plaintff could occasionally bend, squat, climb, and reach above shoulder level, but could never crawl. (Tr. 371). Dr. Hegstad opined Plaintiff should be totally restricted from protected heights, severely restricted from being around moving machinery, moderately restricted from driving automotive equipment, mildly restricted from exposure to marked changes in temperature and humidity, and mildly restricted from exposure to dust, fumes, and gases. (Tr. 371). Finally, Dr. Hegstad rated Plaintiff as mildly affected by pain in her ability maintain attention and concentration, the lowest choice offered by the form (with moderate, severe, and marked as the other choices), and a definition that mild constitutes an irritation but would not impede concentration and attention. (Tr. 371).

### E. Plaintiff's Application for Benefits

Plaintiff started the instant action by applying for DIB and SSI on August 16, 2012, alleging a disability onset date of July 19, 2012. (Tr. 191–202; *see* Tr. 237–44). Plaintiff alleges impairments of lupus, connective tissue disease, high blood pressure, autoimmune hepatitis, and arthritis. (Tr. 238). On initial determination, Plaintiff was

found to have the severe impairments of systemic lupus erythematosus, hepatitis, and inflammatory arthritis. (Tr. 75, 86). Plaintiff was found not disabled on November 27, 2012. (Tr. 70–91; *see* Tr. 118–23). Plaintiff then sought reconsideration. (Tr. 124–28, 257–63, 266–71). Plaintiff was found not disabled on reconsideration on February 15, 2013. (Tr. 92–115; *see* Tr. 129–34). Plaintiff then sought a hearing by an administrative law judge. (Tr. 135–36; *see* Tr. 137–43, 152–76, 181, 184–90).

## F. Administrative Hearing and ALJ Decision

Plaintiff first requested that a favorable determination be made based upon the evidence of record. (Tr. 146–51). No action was taken on this request. ALJ Boyd held a hearing on March 14, 2014. (Tr. 23–40; *see* Tr. 137–43, 152–76, 181, 184–90). ALJ Boyd heard testimony from Plaintiff and vocational expert Warren Haagenson. (Tr. 41–69; *see* Tr. 177–80). ALJ Boyd issued a decision denying Plaintiff's claim for DIB and SSI on March 26, 2014. (Tr. 23–40). In his decision, ALJ Boyd found Plaintiff met the insured status requirements through December 31, 2017. (Tr. 28). ALJ Boyd found Plaintiff did not engage in substantial gainful activity since the alleged onset date of July 19, 2012. (Tr. 28).

ALJ Boyd concluded that Plaintiff had the severe impairments of: status post left knee arthroscopy; lupus/connective tissue disease, inflammatory arthritis; and autoimmune hepatitis. (Tr. 28). ALJ Boyd found Plaintiff's obesity to be non-severe. (Tr. 28–29). ALJ Boyd next found and concluded that none of Plaintiff's severe impairments, either individually or in combination, met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 29). ALJ Boyd determined

Plaintiff had the RFC to perform less than the full range of light work as defined in 20

C.F.R. §§ 404.1567(b), 416.967(b) in that she is limited to:

> lifting 20 pounds occasionally and 10 pounds frequently. The claimant is limited to standing and/or walking up to 2 hours out of an 8-hour day and sitting for 6 hours out of an 8-hour day. The claimant would require the ability to alternate between sitting for 30 minutes and then standing for 5 minutes before resuming a seated position. The claimant should never climb ladders, ropes or scaffolds. The claimant can never climb stairs or use the left lower extremity to operate foot controls. The claimant can occasionally climb ramps and occasionally balance, stoop or crouch. The claimant can never kneel, crawl or reach overhead. The claimant can frequently handle and finger. The claimant should avoid working in an environment where she is exposed to temperature extremes or direct sunlight.

(Tr. 29). ALJ Boyd noted that Plaintiff's medically determinable impairments could

reasonably be expected to cause the symptoms alleged, but Plaintiff's "statements

concerning the intensity, persistence and limiting effects of these symptoms are not

entirely credible." (Tr. 30). In making his RFC finding, ALJ Boyd weighed the medical

record and the opinion evidence of Dr. Hegstad and the state agency medical consultants.

(Tr. 30–33).

ALJ Boyd then found and concluded that, while unable to perform past relevant

work, there are jobs existing in significant numbers in the national economy that Plaintiff

could perform when considering her age, education, work experience, and RFC. (Tr. 33–

34). ALJ Boyd noted that Plaintiff's "ability to perform all or substantially all of the

requirements of [the light] level of work has been impeded by additional limitations."

(Tr. 34). To determine the extent to which the limitations erode the unskilled light

occupational base, ALJ Boyd asked the vocational expert whether jobs exist in the

national or regional economy for an individual with Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 34). The vocational expert testified that, with all these factors, the individual would be able to perform the requirements of representative occupations such as small parts assembler and hand packager. (Tr. 34). ALJ Boyd found the vocational expert's testimony consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 34). Based on the foregoing, ALJ found Plaintiff was not disabled as defined by the Social Security Act. (Tr. 35).

### G. Appeals Council Decision

Plaintiff sought review of ALJ Boyd's decision through the Appeals Council. (Tr. 285–86, 21–22). Plaintiff asserted that the ALJ erred when he failed to obtain a medical expert because additional evidence could have modified the state medical consultant's findings and erred by failing to properly evaluate Plaintiff's physical impairments. (Tr. 285–86). The Appeals Council considered Plaintiff's reasons for disagreeing with ALJ Boyd's decision and found no basis for reviewing his decision. (Tr. 6–11).

Plaintiff then sought review in this Court. Plaintiff and Defendant have filed cross-motions for summary judgment. (ECF Nos. 16, 20).

### III.  ANALYSIS

#### A. Standard of Review

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if she is unable "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. § 404.1505(a). Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)); 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Boettcher*, 652 F.3d at 863 (citing

*Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). This standard requires the Court to "consider the evidence that both supports and detracts from the ALJ's decision." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012) (citing *Ellis v. Barnhart*, 393 F.3d 988, 993 (8th Cir. 2005)). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.* (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578) (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, the court must affirm the [ALJ's] decision." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Likewise, courts "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578.

### B.  ALJ Boyd's Evaluation of Dr. Hegstad's Opinion

Plaintiff asserts that ALJ Boyd erred by failing to analyze the opinion of Dr. Hegstad in accordance with 20 C.F.R. § 404.1527.

Under 20 C.F.R. §§ 404.1527(c), 416.927(c), medical opinions from treating sources are weighed using several factors: (1) the examining relationship; (2) the treatment relationship, such as the (i) length of the treatment relationship and frequency of examination and the (ii) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. If a treating

source's medical opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Treating sources are defined as licensed physicians, licensed or certified psychologists, licensed optometrists, licenses podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007). And "[a] treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). An ALJ "may give a treating doctor's opinion limited weight if it provides conclusory statements only." *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995)).

In looking at Dr. Hegstad's opinion, ALJ Boyd stated he

> acknowledges the physical capabilities evaluation performed by the claimant's treating physician Scott T. Hegstad, M.D. . . . The undersigned notes that under SSR 06-3p, Dr. Hegstad is an acceptable medical source and has a treating relationship with the claimant. Moreover, his opinion is somewhat consistent with the record as a whole; therefore, the undersigned gives it some weight. The undersigned accepts Dr. Hegstad's opinion that the claimant has the ability to lift up to 19 pounds occasionally; however, the undersigned does not accept that the claimant is unable to lift 20 pounds, as the treatment records do not support that the claimant has reduced upper extremity strength. Moreover, the treatment records do not support Dr. Hegstad's opinion that the claimant not be able to adequately

use her hands for fine manipulation, as this is not consistent with the treatment records showing significantly reduced hand and wrist swelling with treatment. The undersigned accepts Dr. Hegstad's opinion that the claimant is limited in her ability to stand and/or walk, as it is consistent with the claimant's complaints of bilateral knee pain and swelling. However, the undersigned does not find evidence to support that the claimant is more limited than the residual functional capacity set forth above.

(Tr. 32–33). The only portion of this analysis that Plaintiff challenges relates to Dr. Hegstad's opinion regarding Plaintiff's use of her hands.

ALJ Boyd's weighing of Dr. Hegstad's opinion, however, followed 20 C.F.R. §§ 404.1527(c), 416.927(c), and is supported by substantial evidence in the record. Dr. Hegstad completed the physical capabilities evaluation on April 10, 2013. In that evaluation, Dr. Hegstad opined that Plaintiff could grasp with her hands, push and pull light weights, could use her hands for repetitive motion tasks but it would likely increase her level of discomfort, and could not use her hands for fine manipulation. That opinion is not consistent with the subsequent chronological medical record. On April 24, 2013, Plaintiff saw Dr. Veetil, noting that her hand swelling had improved following a temporary boost in her prednisone, and only reported knee pain. When Plaintiff saw Dr. Veetil for a follow-up on May 21, 2013, she continued to have no wrist symptoms. On June 17, 2013, Plaintiff saw Dr. Hegstad with complaints of some wrist pain following a decrease of her prednisone dosage. Dr. Hegstad noted Plaintiff had some swelling in her fingers and slight synovial thickening in the metacarpal phalangeal joints of her fingers. Plaintiff's prednisone dosage was increased. On August 8, 2013, Plaintiff saw Dr. Veetil and reported her hands and wrists had improved and examination confirmed this.

Plaintiff's medical treatment records from October 2013 through February 2014 all focus on her knees, particularly her left knee, save for some synovial thickening of a single joint on December 27, 2013, but without corresponding redness or warmth. Given that the medical record showed Plaintiff's wrists had improved with medical treatment, it was not error for ALJ Boyd to discount that portion of Dr. Hegstad's opinion. *Hacker*, 459 F.3d at 937 (citing *Prosch*, 201 F.3d at 1013). Based on the foregoing, the Court concludes ALJ Boyd properly weighed the opinion of Dr. Hegstad and substantial evidence in the record as a whole supports his decision regarding the weight given. *Boettcher*, 652 F.3d at 863.

### C. ALJ Boyd's RFC Determination

Plaintiff argues that ALJ Boyd erred in making his RFC determination. Plaintiff asserts that ALJ Boyd's RFC determination limiting Plaintiff to standing/walking two hours in an eight-hour work day constitutes a sedentary work level, rather than light work. Given that Plaintiff was fifty years old at the time of the decision, Plaintiff argues that SSR 83-10, 1983 WL 31251, directed ALJ Boyd to find her disabled.

Prior to Step Four, the ALJ must assess the claimant's RFC, which is the most a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is a "function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004). "Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the RFC." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012). "Even though the RFC assessment draws from medical sources for

support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619–620 (8th Cir. 2007); 20 C.F.R. § 404.1546(c). The ALJ is tasked with resolving "conflicts among the various treating and examining physicians." *Bentley v. Shalala*, 52 F.3d 784, 785–87 (8th Cir. 1995). While the ALJ retains the authority to determine the RFC and that decision must be supported by some medical evidence, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010).

In making disability determinations, the Social Security Administration relies "primarily on the DOT for information about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1899704, at *2; *see* 20 C.F.R. §§ 404.1566(d), 416.966(d). When determining whether a claimant is disabled, the ALJ may use a vocational expert or other specialist to assist with whether a claimant's work skills can be used in other work and the specific occupations in which they can be used. 20 C.F.R. §§ 404.1566(e), 416.966(e). "Testimony from a vocational expert based on a properly-phrased hypothetical constitutes substantial evidence." *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (citing *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996)). "When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence." *Goose v. Apfel*, 238 F.3d 981, 984–85 (8th Cir. 2001) (citing *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994)). "Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole." *Goose*, 238 F.3d at 985.

Occupations are classified by the DOT as "as sedentary, light, medium, heavy, and very heavy." 20 C.F.R. §§ 404.1567, 416.967.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b). The "full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5–*6; *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995); *see Fenton v. Apfel*, 149 F.3d 907, 911 (8th Cir. 1998) ("the DOT, in its job definition, represents approximate maximum requirements for each position rather than the range.") (citation omitted). If a claimant's "impairments are exertional (affecting the ability to perform physical labor), the Commissioner may" refer to the "medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). If "nonexertional impairments exist that limit the claimant's ability to perform the full range of work in a particular category, then the ALJ cannot rely exclusively on the grids to determine disability but must consider vocational expert testimony." *Frankl*, 47 F.3d at 937.

Here, ALJ Boyd determined Plaintiff had the RFC to perform light work except that she is limited to, in relevant part,

> lifting 20 pounds occasionally and 10 pounds frequently. The claimant is limited to standing and/or walking up to 2 hours out of an 8-hour day and sitting for 6 hours out of an 8-hour day. The claimant would require the ability to alternate between sitting for 30 minutes and then standing for 5 minutes before resuming a seated position. . . . The claimant can never climb stairs or use the left lower extremity to operate foot controls. . . . The claimant can frequently handle and finger. . . . .

(Tr. 29). ALJ Boyd noted that when a claimant cannot perform substantially all of the exertional demands of work at a given level of exertion, the medical-vocational rules are used as a framework for decisionmaking unless a rule directs a conclusion of disabled without considering those additional exertional limitations. (Tr. 34) (citing SSR 83-12 and SSR 83-14). ALJ Boyd found that Plaintiff's "ability to perform all or substantially all of the requirements of [the light] level of work has been impeded by additional limitations." (Tr. 34). Given this reduction in the light work base, ALJ Boyd asked the vocational expert whether jobs exist in the national economy given this reduced RFC. (Tr. 34); s*ee McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (reliance upon the "grid" is not appropriate unless the full range of light work encompassed by the grid can be performed by the claimant), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); *Fenton*, 149 F.3d at 911. The vocational expert testified that an individual with Plaintiff's RFC could perform the representative occupations such as a small parts assembler and hand packager (poly), which are within the reduced range of light work and exist in significant numbers in the regional and national economy. (Tr. 34); *see Frankl*, 47 F.3d at 937; *Gray*, 192 F.3d at 803.

Plaintiff's argument that the sit/stand portion of ALJ Boyd's RFC finding places her outside the scope of light work is unavailing. The ranges of work are separated by the weights lifted: sedentary work involves lifting no more than 10 pounds at a time; light work involves lifting no more than 20 pounds at a time and frequent lifting or carrying of 10 pounds; medium work involves lifting no more than 50 pounds and frequent lifting or carrying of 25 pounds; heavy work involves lifting no more than 100 pounds at a time and frequent lifting or carrying 50 pounds; and very heavy work involves lifting more than 100 pounds and frequent lifting or carrying of 50 pounds or more. 20 C.F.R. §§ 404.1567, 416.967. In the definition for light work, it first addresses the appropriate lifting requirements: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). If those weights are not met, a job may be classified as light work "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). This language shows that the amount of weight lifted, rather than the amount of time spent standing or sitting, characterizes light work. ALJ Boyd's RFC determination found that Plaintiff can perform the lifting requirements of light work. Moreover, this determination is supported by substantial evidence in that Dr. Hegstad, Plaintiff's treating physician, opined Plaintiff could lift/carry up to 19 pounds.

Plaintiff argues that, pursuant to Program Operations Manual System ("POMS") DI 25025.015, ALJ Boyd was directed to find Plaintiff disabled because her RFC fell between light and sedentary, and under the sedentary finding Plaintiff would be

considered disabled under Agency guidelines as a fifty year old claimant. "Although POMS guidelines do not have legal force, and do not bind the Commissioner, [the Eighth Circuit] has instructed that an ALJ should consider the POMS guidelines." *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003) (citing *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000)). Under POMS DI 25025.015, an RFC finding where standing, walking, or sitting is less than the top level of standing, walking, or sitting requirements, that RFC falls between exertional levels of work. POMS DI 25025.015(B) notes that if the exertional capacity falls between two "not disabled" rules, the Commissioner is to use the rule from the lower numbered table as a framework for determination. If the exertional capacity falls between two "disabled" rules, the higher numbered table is to be used as a framework for determination. POMS DI 25025.015(C). And if the exertional capacity falls between rules with different conclusions, the Commissioner uses the higher-numbered rule if concluding the claimant has a slightly reduced capacity of the higher level of exertion, and uses the lower-numbered rule if the claimant has a significantly reduced capacity for the higher level of exertion. POMS DI 25025.015(D).

Plaintiff's argument necessarily rests on the assumption that ALJ Boyd's RFC finding that the two-hour standing limitation constitutes a "significantly reduced capacity" for light level exertion. As discussed above, this assumption is misplaced because such a limitation remains within the light level of work. *See Fenton*, 149 F.3d at 911 (ALJ did not err where vocational expert testified that jobs existed in the national economy could be performed by claimant with two-hour standing limit reducing his ability to do a full range of light work). ALJ Boyd posed a hypothetical to the vocational

expert that included a reduced level of light work, with the vocational expert testifying that occupations existed in significant numbers in the national and regional economy in the light level that a person with Plaintiff's RFC could perform. *See Frankl*, 47 F.3d at 937; *Gray*, 192 F.3d at 803. Thus, the Court finds substantial evidence in the record as a whole supports ALJ Boyd's conclusion that Plaintiff was not disabled. *Boettcher*, 652 F.3d at 863.

[Continued on next page.]

IV.   **RECOMMENDATION**

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (ECF No. 16), be **DENIED** and Defendant's Motion for Summary Judgment, (ECF No. 20), be **GRANTED**.


Date:   January 24, 2017                              *s/ Tony N. Leung*
                                                      Tony N. Leung
                                                      United States Magistrate Judge
                                                      District of Minnesota

                                                      *Torres v. Colvin*
                                                      Case No. 15-cv-4416 (JRT/TNL)


## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.